### ANDERSON et al. v. AMERICAN SMELTING & REFINING CO. et al.

(District Court, D. Utah. December 23, 1919.)

No. 3817.

1. Nuisance ☞33—Evidence held to show that noxious substances were no longer emitted from defendant's smelter.

In a suit to enjoin the operation of smelters, evidence *held* to show that since a prior injunction sulphur trioxide and arsenic were no longer emitted from the smelters' stacks.

2. Nuisance ☞33—Sulphur gas from smelters held injurious to crops.

In a suit to enjoin the operation of smelters, evidence *held* to show. that sulphur dioxide fumes, emitted from the smelter stacks in large quantities, caused serious injury to growing crops, attacking the leaves and foliage.

3. Evidence ☞570—Weight of opinion evidence depends on mentality and environment of witness.

As witnesses who give opinion evidence are sometimes unconsciously influenced by their environment, the weight to be given such testimony should be determined in the light of their knowledge, training, and powers of observation, considered together with any natural bias due to circumstances.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Nuisance ☞33—Crops injured by sulphur fumes.**

In a suit to enjoin the operation of smelters which emitted quantities of sulphur dioxide, *held*, that injury from such gas at critical times in crop development caused serious economic loss.

**5. Nuisance ☞33—Sulphur fumes from smelters held to cause no injury to persons.**

In a suit to enjoin the operation of smelters, evidence *held* to show that sulphur dioxide fumes emitted by the smelters, as mixed with air, caused no injury to health of residents in the vicinity, other than as they were affected by nervous or mental irritation caused by the fumes.

**6. Nuisance ☞3(5)—Smelter constituting a nuisance will be abated.**

A smelter cannot be allowed to operate, where it is a nuisance to the community and injures crops, etc., even if the industry is an important one.

**7. Nuisance ☞7—Operation of smelters will not be enjoined, where there is prospect nuisance can be obviated.**

Where defendants, the operators of smelters which emitted noxious sulphur fumes, which injured crops in the community, admitted their inability in any practical economic way to remove sulphur dioxide from the smoke stream, but it did not appear all possible to obviate injury had been done, the operation of the smelters will be enjoined, unless defendants suggest some way of overcoming the conditions complained of and eliminate further complaint.

In Equity. Suit by John A. Anderson and others against the American Smelting & Refining Company and the United States Smelting Company. Decree for plaintiffs.

J. L. Rawlins, William W. Ray, and Athol Rawlins, all of Salt Lake City, Utah, for plaintiffs.

Franklin S. Richards and E. C. Ashton, both of Salt Lake City, Utah, Francis H. Brownell, of New York City, and Mr. Johnson, for defendant American Smelting & Refining Co.

Howat, Marshall, MacMillan & Nebeker, of Salt Lake City, Utah, for defendant United States Smelting Co.

JOHNSON, District Judge. The defendant the American Smelting & Refining Company operates a smelter located at Murray, in Salt Lake valley, near Salt Lake City. The defendant United States Smelting & Refining Company owns and operates a smelter located at Midvale, situated about three miles southwest of the plant of the said American Smelting & Refining Company. The plaintiffs, 61 in number, are farmers who own or cultivate lands in the neighborhood of said smelters.

This action was brought by the plaintiffs, in behalf of themselves and others similarly situated, to enjoin the operation of said smelters by said defendants and, in their bill of complaint they allege:

"That said smelters, as they have been and are now operated by the defendants, respectively, and as they severally threaten to continue to operate the same, have been, are, and will be nuisances, injurious to the health and offensive to the senses of your complainants, and each of them, and have interfered and will interfere with the comfortable enjoyment of life and the said property of your complainants, respectively. That said smelters are and have been employed in the reduction of ores of lead and copper, or both, which ores are known as sulphide ores and also contain iron sulphates, to-

gether with arsenic, antimony, and zinc. That in the process of reduction the sulphur in said 'ores is reduced and converted into sulphur dioxide and trioxide, all of which is permitted to and does escape in a gaseous form into the atmosphere, and is borne by the winds, together with the dust, smoke, and fumes of arsenic and antimony, over and upon the farms of your complainants, and of those for whom they sue. That many tons of sulphur dioxide, as complainants are informed and believe, thus daily have escaped, and do now escape from said smelters, and have been and are now being spread over and deposited upon the lands in the neighborhood of said smelters, including the said farms of your complainants. That, coming in contact with the moisture in the atmosphere, or falling upon the soil or vegetation, the said sulphur dioxide and trioxide become sulphurous acid, and to some extent is converted into sulphuric acid, injurious to and destructive of all vegetable life. That the fumes and gases aforesaid, escaping as aforesaid from each of said smelters, are commingled in the air, and together work their injurious effects upon the farms, property, and health of your complainants. That the fumes and gases and dust have been and still are permitted to escape and to be deposited upon the farms, causing the destruction of fruit and ornamental trees, and of the various kinds of fruits, cereals, and grasses growing on said farms, or so poisoning the same as to render them unfit for use. That the sulphur dioxide and other fumes, entering the houses of your complainants and polluting the atmosphere, are offensive to the senses, and, as your complainants are informed and believe, are injurious to the health of themselves and their families. That said fumes, gases, and dust, either directly or by poisoning the grasses upon which they feed, have caused and are causing many of the domestic animals of your complainants to sicken and die. That each of said complainants has been, is and will continue to be damaged from the causes aforesaid."

The defendants separately answered the bill of complaint of the plaintiffs and denied the material allegations thereof, interposing also an affirmative plea of laches and a plea invoking the so-called doctrine of comparison of injuries or balancing of conveniences. In the trial of the case evidence was introduced by plaintiffs with respect to the particular things complained of as follows:

Evidence tending to show that arsenic, or, rather, arsenic in combination with other elements, is set free in the operation of said smelters and permitted to escape into the atmosphere; that the arsenic so released in the atmosphere is deposited upon the vegetation growing upon plaintiffs' farms, particularly the grasses, which, being eaten by domestic animals, causes injury to their health, frequently resulting in death; that the gases, sulphur trioxide, $SO_3$, and sulphur dioxide, $SO_2$, are injurious to vegetation and plant life, to metallic substances such as wire screens and wire fencing, and offensive to the senses and injurious to the health of human beings, and that these gases are permitted to escape from the plants of said defendants, and coming in contact with the trees, plants, grasses, and crops growing upon plaintiffs' lands, and with the wire screens and wire fencing thereon, are constantly causing injury thereto, as a result of which plaintiffs respectively suffer great economic loss; that said sulphur dioxide, $SO_2$, is produced in enormous quantities in the operation of said plants of said defendants, and, in addition to causing the injuries above mentioned, is also offensive to the senses and injurious to the health of the said complainants.

Evidence was introduced by plaintiffs tending to show that crops growing upon the farms of plaintiffs, and upon the lands of others in

the vicinity of said plaintiffs, and plant life generally in said neighborhood, had been injuriously affected by $SO_2$ escaping from said smelters, particularly during and since the year 1912, up to and including the year 1916; also tending to show deterioration of wire screens and fencing in said neighborhood, and tending to show that said gas was unpleasant and disagreeable to the senses and injurious to the health of some of the plaintiffs or their families.

The defendants respectively introduced evidence disputing the claims of said plaintiffs made as above stated. The evidence introduced by the defendants tended to show that neither arsenic nor its compounds, nor sulphur trioxide, escape from said smelting plants, or either of them, except an inappreciable quantity of arsenic at the time the bags in the bag houses are shaken. It is admitted that sulphur dioxide, $SO_2$, is permitted to escape into the atmosphere from said smelters, but each of the defendants maintains that the manner of operation of its plant is such that said $SO_2$ is so diluted in the atmosphere that no discomfort is occasioned plaintiffs, or injury done their health, or damage to their growing crops or trees or plants or other vegetation growing on their said lands, or that the wire fence or wire screens upon the premises of said plaintiffs, or upon the lands in the neighborhood of said smelter, are in any way injuriously affected.

It is not disputed that arsenic is usually found in the ores smelted by said defendants, and that if permitted to escape into the atmosphere it would settle to the ground and upon the grasses growing thereon in the neighborhood and vicinity of said smelters, and it is quite clear from all the evidence in the case that animals grazing upon grass so contaminated would be injuriously affected and in many cases would probably die from arsenical poisoning. It is also conceded that sulphur trioxide, $SO_3$, is highly injurious to vegetation, and that it is produced in the operation of said smelting plants.

The evidence introduced in the case shows that large quantities of sulphur dioxide, $SO_2$, are released in the operation of said smelters and are set free from said plants into the atmosphere through stacks, except a small quantity of so-called ground gas in and about the plants. In each of said plants there is a system of flues or chambers into and through which all gases and other emanations from the furnaces are drawn, and from which said gases, etc., are delivered into the stacks. At the base of the stacks there are fans, which force into the said stacks large volumes of air, diluting the said gases.

As before stated, it is claimed by the defendants that every substance released or arising in the process of smelting, such as coal smoke, flue dust, compounds of arsenic, sulphur trioxide, and smelter fumes, are all removed from the gases in the flue system or chambers, and that only sulphur dioxide, with certain other harmless gases, is diverted into the stack and permitted to escape into the atmosphere.

The evidence shows that bag houses are maintained, the purpose of which is to intercept and remove the arsenic in the smoke stream. The smoke stream is forced through the bags in the bag houses. By this process the arsenic in the smoke stream is collected on the inside sur-

face of the bags. These are shaken daily to remove the arsenic collected. The evidence introduced by the defendants also tends to show that the $SO_3$ produced in the operation of said smelting plants is neutralized by the injection of lime or zinc oxide into the flues or chambers through which the smoke stream is conducted.

[1] During the period of time the method and appliances above mentioned have been in use for the removal of arsenic from the smoke stream, the plaintiffs claimed, and introduced evidence tending to prove, instances of arsenical poisoning of animals resulting from the grazing of pastures in the vicinity of the smelters and from the use of hay taken from fields in the neighborhood of the plants of the defendants, and it is also the claim of the plaintiffs that vegetable and plant injury results from the presence of $SO_3$ in the atmosphere, either discharged directly from the stacks of the defendants, or resulting from the oxidation of $SO_2$ discharged from said stacks.

It is claimed by the plaintiffs, and evidence was introduced tending to support such claim, that $SO_2$, acting through the atmosphere or through the soil, or both, caused what has been termed invisible injury to vegetation and economic loss by reduction in yield of crops grown on their lands. I have carefully considered these various questions and claims, and the evidence in the case bearing upon them, and have reached the conclusion that the neutralization of sulphur trioxide, $SO_3$, in the smoke stream of said smelters, has been successfully accomplished by the introduction of lime or zinc oxide in the said smoke stream.

Whether $SO_2$ in the atmosphere, or in contact with plant life, is under any conditions changed into $SO_3$ or into sulphuric acid, as I view it, is of no practical importance in this case. That such a change may result has scientific importance, and, it may be, practical value, in other inquiries; but so far as this case is concerned I shall attribute to $SO_2$ those effects which follow its presence and seem to be justly attributed to it, without any effort to determine with scientific accuracy the changes which may occur in this agent prior to or while in the process of causing the effects resulting from its presence.

[2-4] Evidence was introduced by the parties of the sulphur content of samples of soil and of vegetation in the neighborhood of the plants of the defendants, and also of samples taken at a distance from said smelters for comparison; the purpose of the plaintiffs being to show an abnormal sulphur content in the neighborhood of the smelters, and of the defendants to discredit such a conclusion. I am not impressed with the data upon which the deductions of the respective parties rest in this matter. The data, it seems to me, is too meager for generalization. In addition to this, even though it should be shown that plants in the neighborhood of smelters contain sulphur in an amount in excess of that contained by plants in localities remote from a smelter, the only result of such condition, under the evidence in the present case, would be to show that the plants in the neighborhood of the smelters were abnormal in respect to their sulphur content. Such a condition might or might not affect the vitality of the plant, or

the quantity or quality of the yield of crops. Such a condition evidences a departure from the usual, and perhaps natural; but the power of adjustment of life to environment is too great to base upon such a departure alone the conclusion that it produces a deterioration in the vitality of the plant, or the quality or quantity of yield.

The evidence respecting the effect of the presence of $SO_2$, or possibly $SO_3$, in the atmosphere upon wire screening and fencing creates a suspicion that deterioration results, but the evidence is not of that convincing character that I feel would justify a finding in the case to that effect. The evidence is insufficient to show that the presence of $SO_2$ in the atmosphere causes injury to vegetation and plant life, where there is no external evidence of injury appearing in the plant. In other words, the evidence is insufficient to show any invisible injury to vegetation or plant life occasioned by $SO_2$ acting either through the soil or the atmosphere.

There remains to be considered the claim in respect to injuries caused by $SO_2$ which are visible or apparent. It is an undisputed fact in the case that $SO_2$ in very low dilution in the atmosphere—as low as one part per million under favorable conditions—will injure vegetation; that is, it will mark, dessicate, burn, or bleach plant foliage. Plants vary very considerably in respect to their susceptibility to $SO_2$ injury. Investigators and observers of $SO_2$ injury are, broadly speaking, in practical agreement as to the more sensitive and more resistant plants. The evidence in the case is insufficient to show that $SO_2$, in the concentrations with which we are here dealing, affects the skin or bark—the surface of the body of plants. Fruit in the formative state, pistils, stamen, blossoms of flowers and fruits, silks and tassels of corn, grains in process of heading, are susceptible to $SO_2$ injury, but are more resistant than the foliage of the plant.

It is agreed that $SO_2$, when present in the atmosphere, passes with air into the leaves of plants through the stomata. The effect is, if injury results, that the cells within the leaf are more or less broken down, cell life destroyed, and the leaf within the area of injury becomes marked, burned, bleached, and dessicated. This effect is observable by inspection, and is called visible injury. If $SO_2$, though present in the atmosphere, fails to produce visible markings in the leaf or foliage, the result, if any, upon the plant falls within the domain of so-called invisible injury, which I have already discussed and eliminated from consideration in this case.

The appearance of $SO_2$ injury in the foliage of plants and its extent depend upon certain conditions. These are: (1) The sensitiveness of the plant to $SO_2$ injury. (2) The concentration of $SO_2$ in the atmosphere. (3) The length of time during which the plant is subjected to $SO_2$. (4) The humidity of the atmosphere. (5) The presence or absence of those conditions, which affect or control the opening or closing of the stomata, as light, darkness, heat, or cold.

By the experiments of defendants and others, as well as by the observations of the plaintiffs and their witnesses, the above conditions controlling or influencing the action of $SO_2$ upon vegetable and plant

life are so well attested as not to require anything more than their statement. As a rule SO₂ seems to attack the leaves and foliage at their points and edges, extending into the leaf in proportion to the severity of the injury. The effect of SO₂ injury—that is to say, the markings of the foliage—is observable practically at once. The appearance of the marking of the leaf tends to change somewhat with the lapse of time. The discoloration of the leaves, or the appearance of the markings on the leaves, resulting from SO₂ injury, are not the same in all plants, and are not distinguishable from discoloration and markings resulting from many other causes, whether examined by the eye alone or under a microscope, and so far as the evidence discloses there are no structural or chemical characteristics of SO₂ injury which distinguish it from injury by many other causes. Injury caused by frost, sunburn, sun scald, and alkali are among the causes producing leaf injury in every characteristic similar to that caused by SO₂, that is, a relatively sudden deterioration, disintegration, and breaking down of the internal cell tissue of the leaf.

Leaf injury occasioned by insects directly attacking the leaf of the plant is ordinarily readily distinguishable from SO₂ injury. Such insect injuries are usually discernible by inspection with the eye, and practically always discernible when examined under the microscope. In those cases where the insect attacks the plant at points other than the leaf, with the result that the leaves or blades of the plant show discoloration similar to that occasioned by SO₂, the characteristics of insect injury present in the plant ordinarily will classify the leaf injury as insect and not SO₂ injury.

Fungus diseases of plants, in many cases, cause leaf deterioration identical with SO₂ injury. These bacterial diseases have each their several characteristics, other than the leaf deterioration common to them all and to SO₂ injury, and the presence of the characteristics of disease will ordinarily classify the leaf injury, as injury resulting from disease, and not from the presence of SO₂.

Prior to the entry of the Godfrey decree in 1908, the defendants and others had for many years operated smelting plants in the neighborhood of plaintiffs' lands under conditions and in a manner that made the operation of the several plants a nuisance. The decree in that case enjoined the operation of these various plants. Subsequently by stipulation a decree was entered which permitted the operation of the plants of the defendants with the restraints and under the conditions in said decree mentioned. Prior to the trial of the Godfrey Case, 158 Fed. 225, 89 C. C. A. 139, 14 Ann. Cas. 8, the several smelters had been operated without restraint and under conditions that permitted the escape into the atmosphere, not only of the SO₂ set free in the operation of the said smelters, undiluted by the admixture of any air through the use of fans, but the smoke stream carried with it all the arsenic, SO₃, flue dust, smelter fumes, and other impurities which constitute the component parts of smelter smoke streams. The result of this method of operation of said smelters was: Arsenical poisoning of animals, severe and repeated burning of vegetation, and

the almost constant presence of the unpleasant and disagreeable odors of a relatively high concentration of $SO_2$ in the atmosphere.

The operation of the plants of the defendants under the modified decree in the Godfrey Case was, generally speaking, satisfactory both to the smelter companies and the farmers in the neighborhood for a number of years. The evidence in the case tends to show no particular injuries from $SO_2$ prior to 1912. Beginning with 1912, complaints of $SO_2$ injury to vegetation and of arsenical poisoning of animals became more or less frequent and widespread among the farmers, up to the time of the trial of this action in 1916. The defendant United States Smelting Company had also become dissatisfied with certain of the restraints imposed by the Godfrey decree, and on January 7, 1914, filed in said Godfrey Case a petition praying for a modification of the decree therein in certain particulars. By stipulation of the parties that matter is submitted upon the record made in this cause, and will be disposed of in harmony with the decree to be hereafter entered in this action.

It would extend this opinion to an inordinate length to attempt a detailed analysis of all the evidence in this case. Certain general observations will, I think, suffice to illustrate my views of the case and the conclusions at which I have arrived with respect to the facts and the law controlling the decision.

From what has already been said in respect to $SO_2$ injury and its similarity to injury produced by other causes, it is apparent that in respect to any particular case referred to in the testimony it becomes a matter of some difficulty, and in many cases of extreme difficulty, to decide whether the injury was caused by $SO_2$, as confidently asserted by plaintiffs and their witnesses, and in those cases where the injury was observed by defendants' witnesses, with rare exceptions, as confidently attributed to some other cause by the witnesses of the defendants.

It became apparent from the inception of the trial that there would be a sharp and irreconcilable conflict of opinion between the witnesses of plaintiffs and of defendants with respect to the cause of the injuries complained of by plaintiffs and attributed by them to $SO_2$. During the course of the trial the court, on divers occasions, visited the plants of the defendants, the country in the neighborhood of the smelters, and observed the crops growing upon certain fields, which, as claimed by plaintiffs, had been marked or injured by $SO_2$. Subsequently plaintiffs called witnesses who testified that the appearances so observed by the court had been caused by $SO_2$. The defendants called witnesses who testified that the appearances observed by the court had been occasioned by a cause other than $SO_2$. The court also visited other localities at a distance from the smelters, and inspected fields, trees, plants, and vegetation which it was claimed by the defendants showed injuries identical in appearance to injuries appearing and observed by the court in the neighborhood of said smelters.

These various inspections I found of value in understanding what the witnesses of the respective parties attempted to describe in their

testimony before the court; but I will add that I found at the time, and still find after much reflection thereon, that these inspections were and are of no value whatever in deciding the question in dispute in this case. Indeed, to give any value to these desultory inspections by the court would be an abandonment of the first principle of scientific investigation; that is to say, it would be the forming of an opinion upon superficial and meager observations in a matter theretofore unknown and unthought of.

At the very threshold of the consideration of the $SO_2$ injuries complained of by the plaintiffs, it is well to remember that the witnesses on behalf of both plaintiffs and defendants, upon the ultimate question involved, only give the court their opinions. A field was green; later it was marked in a way characteristic of a number of causes. Summing up more or less the conditions surrounding the changed appearance in the field, plaintiffs' witnesses give it as their opinion and best judgment that $SO_2$ was the cause of the injuries appearing upon the plants in the field; defendants' witnesses in like manner express the opinion and give it as their best judgment that the injury observed was caused by something else other than $SO_2$.

It must not be overlooked that witnesses who give opinion evidence are sometimes unconsciously influenced by their environment, and their evidence colored, if not determined, by their point of view. The weight to be given to such evidence must be determined in the light of the knowledge, the training, the power of observation and analysis, and in general the mental equipment, of each witness, assuming, as I do, that the witnesses of the respective parties were honest and intended to testify to the truth as they perceived it.

Applying the general rule above announced, it may be observed that plaintiffs' witnesses in the main were practical farmers residing in the neighborhood of the smelters; they were untrained observers, and their mental attitude generally was to attribute to the operation of the smelters all injury to plants or animals having a similarity to $SO_2$ injury to plants or arsenical poisoning of animals. Their past experience had taught them that the operation of the smelters theretofore had produced like injuries, and they reasoned, very naturally, from a sufficient cause to an observed effect, and entertained no sort of doubt as to the correctness of their conclusions. Such a state of mind precludes, of course, unbiased investigation, or the probability, at least, of unbiased reinvestigation, even in the light of new knowledge upon the subject. That this state of mind existed is evident from the fact that witnesses identified leaf markings as in their opinion caused by $SO_2$ injury that are, in many instances, clearly attributable to some other cause, as for instance, the withering of potatoes attributed by witnesses to $SO_2$ injury, in many instances was undoubtedly caused by fusarium wilt or rhizoctonia.

The expert witnesses called by plaintiffs, who made a survey of the affected area, made valuable observations; but seem to have assumed as a basis for their conclusions that leaf markings having the appearance of $SO_2$ injury were in fact $SO_2$ injury—an unwarranted generali-

zation. Erroneous assumptions such as these render opinions expressed by witnesses of uncertain value, and cannot be accepted or relied upon, unless accompanied by circumstances or facts otherwise confirming such conclusions.

The defendants called also a number of nonexpert witnesses—mainly farmers residing in places remote from the smelters. These had made observations in the affected area covering a more or less extended period of time. Their knowledge, training, and powers of observation are not superior to those of many of the untrained witnesses called by the plaintiffs. There was, however, an essential difference in the point of view of these witnesses of defendants. The attitude of mind of these witnesses was to account for the leaf markings as observed by them as caused by some other agent or combination of agents than $SO_2$. I do not question the honesty of purpose of these witnesses, as I do not question the honesty of purpose of the witnesses called by the plaintiffs; but the fact remains that, except in the case of a most severe and pronounced burn, as illustrated by that in June, 1914, these witnesses uniformly accounted for all the markings observed by them by ascribing them to soil conditions, the effect of irrigation, or the lack of it, or some other cause, other than $SO_2$.

It is quite evident that the testimony of witnesses whose mental attitude is to account for every injury as produced by some other cause is no more convincing than the testimony of witnesses who attribute every injury similar in appearance to $SO_2$ injury to $SO_2$ as the sole and only cause. The expert witnesses of defendants manifested the same general mental attitude; that is to say, they were able to find a sufficient cause operating in any particular case other than $SO_2$, and therefore gave it as their opinion that such other cause was the real cause of the injury, or markings observed. The real value I find in the testimony of these opinion witnesses of the parties lies in their description of appearances and statement of the surrounding circumstances, rather than in their ultimate expressed opinions.

I have no doubt of the accuracy of the experiments made by the expert and scientific witnesses called by the parties. The research work of these scientific men has been admirable, and it is unfortunate that the plaintiffs and other farmers of the community have not taken more interest in the experimental farms of the defendants, and profited by the information acquired in the operation of said farms and the experiments made at these stations.

### Economic Loss.

There can be little doubt that $SO_2$ injury, when occurring at a critical period in plant development, results in economic loss; that is, substantial diminution of crop yield. The tendency of growing crops is to throw off or overcome the injury inflicted by $SO_2$, or injury caused by any other agent, and the observations of witnesses upon that matter are that markings caused by $SO_2$ will cease to be noticeable, during the season of rapid growth and development, within a

short time; the length of time in any case depending upon the species of the plant affected, the time of year, and, generally, upon every factor that promotes or retards plant growth and development.

The tests made at the experimental farm of the American Smelting & Refining Company tend to minimize the economic loss caused by SO₂ injury. There are many factors to be taken in consideration in determining the question of economic loss by SO₂ injury in any particular case. Under all the evidence in the case, I am led to the conclusion that SO₂ injury occurring at a critical period in plant development, results in appreciable economic loss. Or, stated another way, SO₂ injury, occurring at a time or under conditions unfavorable to plant development and crop yield, causes more or less economic loss.

### Evidence of SO₂ Injury.

It has already been stated that other causes produce leaf markings identical with and indistinguishable from leaf markings produced by SO₂. Frost, alkali in the soil, sun scald following irrigation, sunburn resulting from lack of moisture, are the chief of the causes producing leaf markings identical with and indistinguishable from leaf markings produced by SO₂. The concurrence of a temperature of the atmosphere sufficiently low to cause frost and the universality of the injury to vegetation—that is, the appearance of injury beyond the zone of possible SO₂ injury—will, ordinarily, justify the conclusion that the injury observed under such condition was occasioned by frost. After the early spring, possible frost injury in the neighborhood of the plants of the defendants becomes negligible, and during the summer season may, except in rare instances, be eliminated from consideration in determining the cause of leaf markings observed upon vegetation. Although frost may be eliminated, as above indicated, it still remains true that to determine the true cause of leaf markings in any particular case is, ordinarily, a difficult problem.

It will be observed that each one of the causes of leaf markings producing injuries identical with and indistinguishable from leaf markings produced by SO₂, has its own peculiar and accompanying factors. For instance, frost is accompanied by a temperature below 32 degrees Fahrenheit, and, ordinarily, its effect is observed over a relatively large area of country. Sun scald is accompanied by hot sunshine, preceded by irrigation or rain. Sunburn is accompanied by hot weather and lack of moisture. Alkali injury shows on crops in soils containing alkali. Similarly, SO₂ has its accompanying factor, namely, injury from SO₂ always occurs in the path of the wind blowing over and from the smelting plant or the stacks from which SO₂ is discharged. The presence or existence of an accompanying factor in any particular case is not of itself sufficient to establish the cause. Such accompanying factor is suggestive, however, and, other considerations being taken into account, may lead to a conclusion in any particular case.

It has already been observed that leaf markings caused by SO₂ appear very soon after this gas has had the opportunity, under favorable

conditions, to operate and produce injury. But leaf markings produced by the other causes above noted occur with equal suddenness after the opportunity to produce injury has arisen. So that the lapse of time following an opportunity for injury in any given case is of no aid in the solution of the problem presented, and under like conditions recovery from the effect of leaf injury caused by sun scald or sunburn, and in some cases alkali, is equally rapid as recovery from injury occasioned by $SO_2$; so that the lapse of time required for recovery of a plant from the effects of the injury is no aid in the solution of the problem. It should be noted, however, that in many cases alkali injury persists and is progressive, so that it often happens that a growing crop may show the effects of alkali at first by relatively few and insignificant markings; but these markings, as time elapses, constantly increase in number and extent and persist throughout the growing season. Where injuries of this sort are observed, they may be safely attributed to alkali in the soil.

The distinguishing factor of $SO_2$ injury, as already observed, is that it occurs in the path of the wind passing over the smelter. I do not mean to say that it may not occur at times of apparent calm; but in respect to that I think it may be assumed that there is no such thing as absolute calm, or even a practical calm, that extends over any large area for any great length of time. The defendants have made continuous observations of wind direction for a period of time covered by much of the testimony in this case, and I have been unable to find that the recorded wind direction rebuts or discredits the possibility of $SO_2$ injury in any of the cases to which I have given close attention, or to which I shall hereafter refer.

Another feature of $SO_2$ injury, distinguishing it from similar markings by other causes, is a path or zone of markings showing the course and direction of the gas, and which, as above noted, is always in the direction of the wind from the smelter at the time. This path or zone is fan-shaped, increasing in width from the smelter. I am satisfied, however, from all of the evidence in the case—direct evidence of witnesses identifying $SO_2$ injuries under conditions which eliminate the probability of the injury being occasioned by other cause or causes—that a well-defined path or zone extending from the immediate neighborhood of the smelter is not an invariable accompaniment of $SO_2$ injury. Severe and extensive $SO_2$ injury is so characterized. There are instances shown by the evidence of $SO_2$ injury showing locally and without the accompanying characteristic of a fan-shaped path or zone extending from the smelter, at least observed and traced, and I am led to the conclusion that at times the gas stream is deflected to the ground at points more or less distant from the plant by air currents, with resulting $SO_2$ injuries.

The defendants, in the operation of their smelters since the Godfrey decree, have assumed very different attitudes respecting $SO_2$ injury, claimed to have been caused by them, respectively. Under the evidence it does not appear that any serious, well-defined complaints were made prior to 1912. Including that year and since, many complaints

have been made of alleged injury by $SO_2$ by farmers residing in the neighborhood of said smelters. In respect to such complaints the defendant American Smelting & Refining Company made investigations and in many cases admitted the injury and made settlement of the estimated loss occasioned by such admitted injury. In respect to complaints of $SO_2$ injury claimed to have been done by the defendant United States Smelting Company, this company made investigation, but in no case, so far as the record shows, admitted the injury or made any settlement with any claimant. The action of the United States Smelting Company in this regard was in accord with the assumption, apparently made by it, that the existence of a well-defined path or zone of injury extending from the smelter was a necessary characteristic and invariable accompaniment of $SO_2$ injury. Such a path or zone of injury did occur in June, 1914. The defendant United States Smelting Company admits $SO_2$ injury by it at that time. No claim was made against the company for damages on account of this injury. The American Smelting & Refining Company, while claiming that a path or zone leading from the smelter is an accompaniment of $SO_2$ injury, seemed either to have been able to trace and observe such zones in the cases settled by them, or to have otherwise been convinced that the injuries complained of were occasioned by $SO_2$ discharged from their plant.

It is to be noted at this time that the officers of the American Smelting & Refining Company have had a long and extended experience in the observation of $SO_2$ injury, and it is not probable that the officers of the company charged with the duty of making these settlements were not reasonably certain that the injuries claimed by the farmers were actually caused by $SO_2$ discharged from their plant. Such allowance and payment is an indication that the investigating officers of said company approached the question with open minds, and this mental attitude of the officers and agents of the defendant American Smelting & Refining Company towards $SO_2$ injury renders their evidence more reliable and more to be trusted than if they had in no case admitted that the injury complained of was $SO_2$ injury, and had assumed that there could be no $SO_2$ injury, except when accompanied by a path or zone of injury extending fanshaped from their smelter, so well defined as to be beyond dispute, as appears to have been the case in June, 1914. And in this connection I may make the further observation that the officers and agents of the American Smelting & Refining Company have had much and long experience with the effects of $SO_2$ upon vegetation, both in appearance and result upon crop yield. Their relation to such injury and its results have been such, I assume, as to make them cautious in making admissions. Those markings upon crops which they and the farmers agreed were $SO_2$ markings, and for which settlement was made, are instances of $SO_2$ injury and economic loss conclusively proven in the case, at least against the defendant American Smelting & Refining Company, and, in addition, these instances tend to establish standards of appearances, circum-

stances, and conditions evidencing $SO_2$ injury, by which to judge and determine disputed cases.

Applying the indicia of $SO_2$ injury to particular instances of claimed $SO_2$ injury, I find that the testimony shows the existence in September, 1915, of a well-defined path or zone of $SO_2$ injury extending northerly from the smelter of the defendant United States Smelting Company; a path or zone of burning in June, 1914, extending in a southerly direction from each of the smelters of the defendants (this burning is admitted); admitted burning extending northeast from the plant of the American Smelting & Refining Company on June 5, 1915; the admitted burnings settled for by the American Smelting & Refining Company hereinbefore referred to; the burning of the grain field of A. F. Rundquist and other crops in his neighborhood on July 6, 1915, by $SO_2$ discharged from the plant of the United States Smelting Company.

Without attempting to go into detail, the preponderance of the evidence shows frequent burnings of crops by $SO_2$ discharged from the plants of the defendants during the years 1913, 1914, and 1915, of more or less severity, and in some cases at least resulting in some economic loss.

During the year 1916 I find that the preponderance of the evidence favors the conclusion that the Lehman field of oats, the Doty field of beets, the field of W. L. Turner, the field of B. S. Bastian, and certain of the fields east of the United States Smelting Company's plant were burned by $SO_2$ discharged from the plant of said company, and that certain markings and burnings north of the American Smelting & Refining Company's plant were caused by $SO_2$ discharged from the plant of the said American Smelting & Refining Company.

It would prolong this opinion to an unreasonable and, as I view the case, an unnecessary length to attempt to make specific findings in each instance of claimed injury appearing in the testimony of the witnesses of the plaintiffs. In very many of these instances of claimed injury, the weight of the evidence indicates other causes than $SO_2$. In many, under the evidence, the cause is obscure. In many others, the preponderance of the evidence indicates $SO_2$ injury. However, in many of these last-named instances the evidence respecting the same is the testimony of the witnesses of the plaintiffs alone, without the benefit of a check by observers representing the defendants.

By reason of the mental attitude of the witnesses, as already noted, and by reason of the prevalence of plant diseases, particularly in potatoes, beans, and certain other garden and farm plants, and by reason of the presence of alkali in many places within the affected district, as well as excessive heat and drought during the growing season, I find it necessary in these ex parte instances of claimed injury to proceed with caution in reaching the conclusion that $SO_2$ was the cause of the injury complained of in any specific case. I am convinced from the testimony in the case (and I have reread the whole of the testimony with great care since the trial) that, while the witnesses of the plaintiffs were mistaken in many instances with respect to the cause of the injuries appearing upon the plants and crops observed by them,

nevertheless in many cases they were not mistaken, and that during the series of years covered by the testimony the defendants, in the operation of their plants, have not at all times been able to so control or dilute the $SO_2$ being discharged from their plants as to avoid doing injury to vegetation in the neighborhood of said plants, and I am convinced, under all the evidence in the case, that the defendants have not yet reached a solution of the problem of preventing and avoiding $SO_2$ injury to vegetation in the operation of their respective plants.

The results observed during the year 1916 tend to show that the American Smelting & Refining Company, in its method of operation, has more nearly approached the point of safety in operation than has the defendant United States Smelting Company. Indeed, it would be remarkable if this were not true. The American Smelting & Refining Company has always realized the probability of doing injury; its latest effort to avoid injury being the adoption and application of its so-called "sea captain" principle of operation. On the other hand, the United States Smelting Company, believing its appliances sufficient and its manner of operation safe, has concluded that no further improvements are needed or necessary, and has refused to admit doing injury at all during the series of years covered by the testimony in this case, except in the one isolated case of June, 1914, which occurred under abnormal conditions, and which subsequent improvements made by the company rendered a repetition practically impossible.

Unquestionably the "sea captain" principle is a salutary method of operation. This conclusion is demonstrated, to a certain extent at least, by a comparison of the $SO_2$ injuries inflicted by the two smelters during the season of 1916. It is to be regretted that the application of this "sea captain" principle in the operation of the smelter has not proven a complete amelioration of the conditions complained of and an elimination of all danger of $SO_2$ injury.

The presence of $SO_2$ in the atmosphere in extreme dilution, three, four, or five parts per million, may be detected by its action upon the senses, its smell, and action upon the eyes and the membranes of the nose and throat. The smell of it is unpleasant, and, if continued for any considerable length of time, is distinctly disagreeable, particularly so where the subject is in that mental or physical state that the presence of the gas in the atmosphere produces nervous irritation—apparently the attitude of practically all of the farmers and their families residing within the affected area. What the witness John Oberlander, an employé of the American Smelting & Refining Company, would not observe, would irritate the witness Mrs. Elizabeth Helm beyond measure, resulting in headaches, sleeplessness, etc. The one takes the presence of $SO_2$ in the atmosphere and the smell of it as a matter of course and part of his day's work; the other considers its presence in the atmosphere an unwarranted invasion of her rights, and its smell an unmitigated nuisance and a certain forerunner, as she believes, of injury to her growing crops and the vegetables growing in her garden.

[5, 6] I do not find from the evidence in the case that the presence of $SO_2$ in the atmosphere, as discharged by the plants of the defendants, does physical injury or is injurious to health, except as the health

may be and is affected by mental and nervous irritation as above indicated. On account of the prevalent nervous irritation existing among the farmers in the vicinity of the smelters, engendered by the presence of $SO_2$ in the atmosphere, it is quite evident there can be no solution of the so-called smelter smoke problem satisfactory to all the parties concerned, unless $SO_2$ is removed entirely from the smoke stream in the operation of the plants, or so diffused in its discharge from the plants that the concentration at the surface of the earth will be reduced to a point imperceptible by the senses. Such a diffusion of the gas would probably make it practically impossible that any substantial injury to plants would occur, or economic loss result. Unquestionably this should be the goal, in the one way or the other, for which these defendants, and the smelter industry generally, should strive. The industry is an important one. Upon the operation of smelters depends the successful operation of mines; but no industry, however important, can justly claim the right to live or operate which creates a nuisance in operation or trespasses upon the property or the inherent personal rights of others.

[7] In this case the defendants confess their inability, in any practical economic way, to remove the $SO_2$ from the smoke stream. I am not yet convinced that the concentration of $SO_2$ at the surface of the ground, released into the atmosphere by the defendants in the operation of their plants, has reached an irreducible minimum; but it would be presumptuous on my part to suggest possible improvements. Three years have elapsed since the trial of this case. Our part in the Great War has intervened. The world has learned much; the scientific world not the least. I sincerely hope that in the application of new knowledge a means may be, if it has not already been, found and applied to overcome the conditions accompanying the operation of smelters complained of in this case.

In view of the amelioration of conditions existing since the Godfrey decree, as compared with the conditions existing prior to that decree, I do not believe the limit of improvement has been reached, or that it is impossible for the smelting and farming interests to exist in the same neighborhood to the advantage of both and without discomfort or injury to the farming community. On the other hand, in this period of the world, when the right of every human being to live in comfort has become a universally accepted principle in American life, I am loath to believe that the law, or the courts in applying it, will condemn any community of citizens to suffer perpetual discomfort or injury resulting from an unavoidable industrial nuisance. During the continuance of the Great War plaintiffs could very well endure some discomfort and take the chance of some economic loss in the public interest, but now that the war is ended they should not be required to do so for any private interest whatsoever.

My conclusion is that, if defendants will suggest a method of operation that will overcome the conditions complained of in this case and eliminate cause of further complaint, a decree will be entered accordingly, or if they will suggest a method of operation or further improvement that gives fair promise of accomplishing the desired result,

the court is inclined to afford them every opportunity to continue their business. Indeed, it is my earnest wish that they may be able to accomplish so desirable a result, as it is my conviction that such a result is not only possible, but feasible. Failing in either of the alternatives above suggested, a decree will be entered in accordance with the prayer of plaintiffs' complaint.

The matters herein suggested will be taken up in the near future at some date agreeable to the court and to counsel in the case.