### SAUDER v. DITTMAR et al.

### DITTMAR et al. v. MOORE et al.

### Nos. 2126, 2127.

Circuit Court of Appeals, Tenth Circuit.

Feb. 27, 1941.

As Amended on Denial of Rehearing
April 15, 1941.

W. F. Lilleston, of Wichita, Kan. (Jos. G. Carey, of Wichita, Kan., on the brief), for appellant and cross-appellees.

Austin M. Cowan, of Wichita, Kan., and Alfred M. Seddon, of Kansas City, Mo. (John R. James, of Kansas City, Mo., on the brief), for appellees and cross-appellants.

Before BRATTON and MURRAH, Circuit Judges, and KENNAMER, District Judge.

BRATTON, Circuit Judge.

Safeway Lines, Inc., was engaged as a common carrier in the operation of buses between Chicago and New York, and intermediate points. Paul O. Dittmar, a resident of Illinois, and Clarence E. Eldridge, a resident of New York, owned 2,166.66 shares of its stock, each owning 1,083.33 shares; A. E. Greenleaf, H. H. Moore and D. E. Sauder, residents of Kansas, together owned 2,166.66 shares; and that was all of the outstanding stock. On March 23, 1936, Dittmar and Eldridge, as sellers, and Greenleaf, Moore and Sauder, as purchasers, entered into a written contract in which it was provided that the sellers should sell their stock to the purchasers for $150,000, payable $15,000 in cash, and the balance in ten annual installments of $13,500 each, with interest, the first due on April 10, 1937; that all payments of principal and interest should be made to Harris Trust & Savings Bank, of Chicago; that the shares of each of the sellers should be represented by two certificates, one for 500 shares issued in the names of the purchasers or their nominees and duly endorsed in blank, and the other for 583.33 shares, issued in the names of the sellers and likewise endorsed in blank; that all certificates should be deposited in escrow with Harris Trust & Savings Bank, as trustee, with instructions that they should be delivered to the purchasers as soon as the purchase price had been paid in full but in the event of default for thirty days in the payment of any installment of principal or interest the certificates should be delivered on demand to either of the sellers or to any person duly authorized by both of them; that as long as any part of the purchase price remained unpaid the sellers should have a representative on the board of directors of the corporation, and the purchasers should vote their stock for his election; and that the purchasers might at any time pay any unpaid balance, together with accrued interest to that time, and in that event they would also pay to the sellers a further sum equal to any additional state or federal tax or other tax which the sellers were obligated to pay as the result of such prepayment. On the same day the parties entered into a supplemental contract providing that the sellers should waive all obligation on the part of the corporation to repay them advances which they had previously made to it in the approximate aggregate sum of $10,000; and that the sellers should have one director of their choice and the purchasers five of their choice, and all stock should be voted accordingly. And on the following day, the parties executed and the trustee accepted an instrument of escrow conforming to the original contract and providing, among other things, that such escrow agreement might be amended or varied in any respect by Dittmar or C. O. Keller on behalf of the sellers, and by Greenleaf or J. H. Eaton on behalf of the purchasers. The cash payment was made; the stock was transferred on the books of the corporation, 583.33 shares to Dittmar, 583.33 to Eldridge, and 1,000 to Greenleaf; all of such certificates were endorsed in blank and deposited with the trustee as collateral security for the debt due Dittmar and Eldridge; and soon thereafter Moore succeeded Dittmar as president and manager of the corporation but Dittmar continued throughout as a director.

General Improvement Company controlled through ownership of stock Southern Kansas Stage Lines, a common carrier by bus. Greenleaf, Moore and Sauder also owned stock in Southern Kansas. Safeway and Southern Kansas connected and interchanged passengers at Chicago. Safe-

way became in urgent need of additional cash in its capital structure. General Improvement indicated a willingness to purchase 1,000 shares of Safeway stock at $75 per share provided all stockholders would contribute to the capital $40 per share in cash, aggregating $173,332.80. Greenleaf and Moore were willing to sell stock and make their contribution in cash but Sauder was averse to making his contribution. There was contemporaneous discussion of the problem of common control of Safeway, Southern Kansas, and other like companies, in seeking necessary consent and approval of the Interstate Commerce Commission. Confronted with these circumstances, Moore and Sauder, on or about June 10, entered into an agreement in which Moore transferred to Sauder his stock in Southern Kansas; Sauder transferred to Moore his stock in Safeway, and his interest in the contract and stock in escrow; Moore assumed Sauder's obligation under the contract of March 23; and each severed all connection with the other company.

It was believed that the cash contribution to the capital of Safeway would entail certain income tax liability unless all share holders contributed pro rata. So, Greenleaf and Moore exhibited to Dittmar a copy of a proposed contract between themselves and General Improvement for the sale and purchase of the 1,000 shares, and, by letter dated July 28, requested that Dittmar and Eldridge agree that the 583.33 shares issued in the name of each be withdrawn from escrow, and that new certificates of the same aggregate amount, issued in the names of Greenleaf and Moore and by them endorsed in blank, be substituted in escrow as collateral for the debt due under the original contract. As part of the request, it was provided that an indebtedness in the approximate sum of $15,000 which Safeway and Illinois Safeway Lines, Inc., owed South Suburban Safeway Lines, Inc., should be paid in full on or before September 1; that until the indebtedness due Dittmar and Eldridge under the agreement of March 23 was paid in full proxies running to them, or either of them or their representatives, to vote 1,166.66 shares of stock in Safeway should be executed and delivered from time to time at least ten days prior to the holding of any meeting; that notice of all stockholders' meetings should be sent them at the same time and in the same manner as notices to other stockholders; that in the event notice was not sent them and a meeting was held at which business was transacted, Greenleaf and Moore should upon demand assign, transfer and deliver to Dittmar and Eldridge each one share of stock for the sole purpose of making them stockholders of record; that in case of failure to receive notice of any subsequent meeting of stockholders at which business was transacted, Greenleaf and Moore should pay in full the then unpaid balance of the purchase price of the stock, together with a sum equal to any additional federal income tax which Dittmar and Eldridge might be compelled to pay by reason of such prepayment; that in the event either Greenleaf or Moore should sell, assign or transfer any of his right, title or interest in any of the shares for which Dittmar or Eldridge were entitled to proxies, the contract of sale should be conditioned that the purchaser execute the proxies from time to time; and that Greenleaf and Moore ratified, approved and confirmed all of the terms and provisions of the original contract, except insofar as they were modified by the agreement then executed. Dittmar and Eldridge agreed to the request; and Dittmar and Eaton joined in a written direction to the trustee to deliver the 2,166.66 shares in escrow to the secretary of Safeway in exchange for four certificates representing a like number of shares, two issued in the name of Greenleaf and two in the name of Moore. The certificates were accordingly withdrawn; the new certificates were issued and endorsed in blank; and they were placed in escrow as substitute collateral for the obligation due Dittmar and Eldridge. Greenleaf and Moore paid the installment of principal and interest due in April, 1937. In November, Safeway filed its petition under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, but was continued in possession of its properties. An operating trustee was appointed in 1939; the debtor was adjudged a bankrupt; and the subsequently appointed trustee sold its assets. Default was made in payment of the installment of principal and interest due Dittmar and Eldridge in April, 1938. The stock of Safeway had no market value at that time.

Dittmar and Eldridge instituted this suit against Greenleaf, Moore and Sauder. They alleged that default had been made in payment of the installment due in 1938; that defendants had repeatedly announced and declared their intention not to pay the installments past due or any of the install-

ments subsequently to mature; that they had repudiated the contract; and that plaintiffs were ready, able and willing to perform all of their obligations under its provisions. Copies of the original and supplemental contracts, of the escrow agreement, and of the letter requesting the substitution of stock in escrow were attached to the complaint; and a copy of the letter directing the trust company to surrender the old shares and accept the new was attached to a bill of particulars. Judgment was sought for the sum of all unpaid installments, with interest. Defendants answered separately. Sauder pleaded that modifications and changes in the original contract, made after Moore assumed his obligation, discharged him of all liability under its terms; and that it had been abandoned as to him.

The court found and concluded that the transfer of the stock from Sauder to Moore was not made at the request or with the consent of plaintiffs; that plaintiffs did not consent to release Sauder from his obligation under the contract; that the transfer did not relieve, discharge or release him; that the annual installments were not accelerated either by the terms of the contract or by the acts or conduct of the parties; and that plaintiffs were entitled to judgment for the amount of the installment which matured in 1938, with interest. Thereafter, on motion of plaintiffs, the action was dismissed with prejudice as to Greenleaf; and judgment was entered against Moore and Sauder for the amount of the installment due in 1938, with interest, less the proportion for which Greenleaf was liable. Sauder appealed from the judgment against him; and plaintiffs perfected a cross-appeal from the failure of the judgment to include the additional sum of $108,000, with interest, representing the subsequent installments. For convenience, subsequent reference will be made to the original contract and the supplemental contract in the singular.

■ The first question relates to the law which governs the rights and liabilities of the parties. The original contract, the escrow agreement, the letter requesting the substitution of stock as collateral security, and the letter directing the trustee to surrender the original shares and accept others in substitution were each executed in Illinois and were to be performed in that state; and the substitution of the collateral was effected there. It is uniformly held that where a contract is executed and is to be performed in the same state, its meaning, interpretation, obligation and effect are to be determined by the law of that state. In re McCurdy's Estate, 303 Pa. 453, 154 A. 707; Liljedahl v. Glasgow, 190 Iowa 827, 180 N.W. 870; Liebing v. Mutual Life Ins. Co. of New York, 276 Mo. 118, 207 S.W. 230; Canton Trust Co. v. Durrett, 320 Mo. 1208, 9 S.W.2d 925; F. W. Offenhauser & Company v. Cupp, 179 Ark. 361, 16 S.W.2d 7; Seemann v. Eneix, 272 Mass. 189, 172 N.E. 243; Knight v. Fidelity & Casualty Company of New York, 184 S.C. 362, 192 S.E. 558.

■ The contract between Moore and Sauder was verbal. It likewise was entered into in Illinois; the stock in Safeway which Sauder transferred to Moore was delivered in that state; and the stock in Southern Kansas which Moore transferred to Sauder was delivered in Kansas. No evidence was adduced at the trial bearing directly upon the intention of the contracting parties in respect to the place of performance. It is the general rule that where a contract is silent respecting the place of performance it is governed by the law of the state in which it was executed concerning its nature and interpretation. Stated otherwise, in respect of its nature and interpretation, a contract is presumed to have been entered into with reference to the law of the state in which it was executed, unless it appears that the contracting parties intended otherwise. Pritchard v. Norton, 106 U.S. 124, 137, 1 S.Ct. 102, 27 L. Ed. 104; Mutual Life Insurance Co. of New York v. Cohen, 179 U.S. 262, 21 S.Ct. 106, 45 L.Ed. 181; Lawrence National Bank v. Rice, 10 Cir., 82 F.2d 28; Thomas G. Jewett, Jr., Inc., v. Keystone Drilling Co., 282 Mass. 469, 185 N.E. 369, 87 A.L. R. 1298; Illinois Fuel Co. v. Mobile & O. R. Co., 319 Mo. 899, 8 S.W.2d 834, certiorari denied 278 U.S. 640, 49 S.Ct. 34, 73 L. Ed. 555; Deins' Administrator v. Gibbs, 257 Ky. 469, 78 S.W.2d 346; New York Life Insurance Co. v. Scheuer, 198 Ala. 47, 73 So. 409; Beck & Gregg Hardware Co. v. Southern Surety Co., 44 Ga.App. 518, 162 S.E. 405. Absent proof of an express agreement otherwise, and a contrary intent not being fairly deducible from the circumstances attending the transaction, the law of Illinois also governs in respect of the nature, interpretation and obligation of this contract.

It is contended that the changes in the original contract and in the relations of the parties, made by and in consequence of the modifying agreement, without Sauder's knowledge or consent, released him of liability under the original contract; and that, not being a party to the subsequent agreement, he is not bound by it. Dittmar and Eldridge learned sometime prior to July 28 that Moore had acquired the interest of Sauder in the original contract and in the stock in escrow. But Eldridge did not know that Moore had assumed Sauder's obligation, and the evidence is in conflict as to whether Dittmar had knowledge of that fact. In Conwell v. McCowan, 81 Ill. 285, McCowan and Conwell executed a note payable to Thompson, with the Walkers as sureties. McCowan and Conwell had been partners, and the note represented a debt of the firm due Thompson. The partnership was dissolved. Conwell assumed payment of its liabilities, including the note to Thompson. He executed a mortgage to secure the note due Thompson, and to indemnify McCowan that neither of the sureties would have to pay it. The court held that as between themselves Conwell became principal and McCowan surety upon Conwell's assumption of the debt, but that as to Thompson they were both principals. In Chandler et al. v. Higgins et al., 109 Ill. 602, it was held that "where one partner, on the dissolution of the firm, assumes, for a consideration, to pay the firm debts, as between themselves the other partners are sureties for him. As respects third parties, of course their relations are not at all changed." In Fish v. Glover, 154 Ill. 86, 39 N.E. 1081, it was held that, as between the mortgagor and the grantee of the mortgaged property, the latter became the principal and the former the surety for payment of the debt; but that, in the absence of consent on his part to such relationship, the mortgagee had the right to treat both as principal debtors, and have personal judgment against them. In Scholten v. Barber, 217 Ill. 148, 75 N.E. 460, the owner of a tract of land executed a trust deed to secure a promissory note. She subsequently conveyed the land by warranty deed, and in the conveyance the grantee assumed the incumbrance. Several quit-claim deeds followed, each without assumption. The owner of the note and the last purchaser of the premises entered into an agreement extending the time of payment of the note, without the knowledge or consent of the maker. The trust deed was foreclosed, the proceeds were applied on the note, and the suit was against the maker for the balance due. The court held that the extension did not operate to discharge her. But in the subsequent case of Prudential Insurance Co. v. Bass, 357 Ill. 72, 191 N.E. 284, Bass and his wife executed their note and mortgage to the insurance company. The note was due five years after date, with the privilege of paying in multiples of $100 at any interest-paying time, but not to exceed one-fifth of the principal during any one year. Bass and his wife conveyed the mortgaged premises by warranty deed. The deed recited that the grantees assumed the debt. Shortly after the maturity of the note, the insurance company and the grantees, without the consent of Bass and his wife, entered into an agreement which extended the note, reduced the interest, and provided that any multiple of $100 could be paid at any interest-paying time. Bass and his wife were joined as parties defendant in the suit to foreclose the mortgage, with prayer for a personal judgment against them. It was held that the extension exonerated them from liability. And in the still later case of Kazunas v. Wright, 286 Ill.App. 554, 4 N.E.2d 118, Wright and his wife executed a trust deed to secure the payment of two notes. They subsequently conveyed the land by warranty deed, subject to the indebtedness, but the grantee did not assume it; and three similar conveyances from grantor to grantee followed. Extensions in the time of payment were effected by agreement of the holders of the notes and grantee owners of the equity in the land, without the knowledge or consent of Wright and his wife. The court held that, despite the absence of assumption of the debt, the extensions released the makers of the notes from liability.

■■ A careful analysis of these cases leaves little room for doubt that under the law of Illinois where two persons are equally bound upon a note or similar obligation, and, by their mutual agreement, one assumes the obligation of the other for its payment, as between themselves, they become principal and surety. But as to the obligee, they both continue to be principals unless he agrees to the changed relation. Still, if the obligee, with knowledge of the assumption, and without the consent of the surety, grants an extension of time for the payment or discharge of the obliga-

tion, or otherwise changes the contract in a substantial manner to the wrong of the surety, he is discharged of liability.

■ Here Sauder signed the original contract and the escrow agreement; a copy of the original contract was attached to the escrow agreement and expressly made a part of it; the escrow agreement provided in clear language that it might be amended or varied in any respect by Dittmar or C. O. Keller on behalf of the sellers, and by Greenleaf or J. H. Eaton, on behalf of the purchasers; and Dittmar and Eaton joined in directing the withdrawal of the original shares from escrow and the substitution of the new. Moreover, the principal provisions of the original contract were the sale of a designated number of shares of capital stock in Safeway at a fixed price, payable $15,000 in cash and the balance in specified annual payments, with respective rates of interest before and after maturity; the escrow of the stock endorsed in blank with an agreed trustee, accompanied by instructions to deliver it to the purchasers upon payment in full of the purchase price and to return it to the sellers or their nominee in case of default for thirty days in the payment of any installment of principal or interest; and the selection of directors of Safeway in the manner detailed. The quantity of the stock was not changed by the subsequent agreement. The sale price remained unchanged. The amount due and the terms of payment were not modified. The respective rates of interest before and after maturity were the same. And there was no change of escrow trustee. The names of the persons to whom the certificates were issued were not identical. But none of the certificates was issued in the name of Sauder. His name did not appear in any of them, either original or substitute. And all of them were endorsed in blank and deposited with the same trustee as collateral for the same debt. It was provided in the subsequent agreement that Safeway should discharge a certain obligation on or before a fixed date. But Safeway was obligated for the debt at the time of the execution of the original contract. No new debt was created, and no existing obligation was increased. And the provision for payment of the balance due upon the obligation to Dittmar and Eldridge in the event of failure to give them notice of meetings of stockholders, followed by the transaction of business, merely obligated Greenleaf and Moore, but not Sauder, to make accelerated payment of an obligation for which they and Sauder were jointly and severally bound by the original contract. Considered in their relation to the nature and scope of the contract as a whole, the changes or new provisions in the subsequent arrangement were quite subordinate and incidental. It is plain from the whole case that there was no intention or purpose to release Sauder, and we think the acts and conduct of the parties did not effect his release.

■ It is further contended that the original contract was abandoned as to Sauder. It is said that the subsequent agreement modified the former in many respects; that it contained some provisions of the old and added others; that the original contract was thus superseded and Greenleaf and Moore were no longer bound by it; and that it was therefore abandoned in its relation to Sauder. It is not contended that plaintiffs and Sauder ever entered into an agreement expressly abandoning the contract as to him or extinguishing his liability under its provisions. Reliance is placed upon acts and conduct to constitute abandonment. Of course, a contract may be abandoned by mutual consent. And such consent may be implied from the acts and conduct of the parties. City of Del Rio v. Ulen Contracting Corp., 5 Cir., 94 F.2d 701; Treadwell v. Nickel, 194 Cal. 243, 228 P. 25; Thompson v. Municipal Bond Co., 23 Cal.App.2d 402, 73 P.2d 274. Cf. Hayward v. Burke, 151 Ill. 121, 37 N. E. 846; Henry v. Caruthers, 196 Ill. 136, 144, 63 N.E. 629; McKenna v. McKenna, 118 Ill.App. 240. A contract will be treated as abandoned when the acts of one party inconsistent with its existence are acquiesced in by the other. Baker v. School District No. 48, 120 Neb. 513, 233 N.W. 897; Reichert v. Mulder, 121 Neb. 11, 235 N.W. 680; Hahn v. General American Life Ins. Co. 132 Neb. 509, 272 N.W. 321; Tulsa Opera House Co. v. Mitchell, 165 Okl. 61, 24 P.2d 997. But where acts and conduct are relied upon to constitute abandonment, they must be positive, unequivocal and inconsistent with an intent to be further bound by the contract. City of Del Rio v. Ulen Contracting Corp., supra; Wheaton v. Collins, N.J.Ch., 84 A. 271; May v. Getty, 140 N.C. 310, 53 S.E. 75; Singleton v. Atlantic Coast Line R. Co., 203 N.C. 462, 166 S.E. 305; Mood v. Methodist Episcopal Church South, Tex.

Civ.App., 289 S.W. 461. Cf. Hayward v. Burke, supra; Henry v. Caruthers, supra.

The provisions contained in the original contract, those which were not changed or modified by the subsequent arrangement, and the changes effected, have been detailed at length. As previously said, the principal provisions were not changed. The changes effected related to provisions and matters which were subordinate and incidental in importance, when considered in connection with the nature and scope of the contract as a whole. Repeating, by the terms of the escrow agreement the original contract was made a part of it. And the escrow agreement provided that it might be amended or varied in any respect by Dittmar or Keller on behalf of the sellers, and by Greenleaf or Eaton on behalf of the purchasers; and the withdrawal of the original certificates of stock and the substitution of the new certificates in escrow was expressly authorized by Dittmar and Eaton. In addition, it appears without dispute or contradiction that Eldridge stated in a telegram to Dittmar, dispatched on the day preceding the substitution of the stock, that he wished to cooperate in every way and that his only concern was that nothing be done which would jeopardize their interest or lessen their security. The acts and conduct of Dittmar and Eldridge were not clearly inconsistent with the continued existence of the principal provisions of the original contract. And it is plain that abandonment of the contract as to Sauder was not intended or contemplated. There was no effectual or consummated abandonment as to him. Cf. Hayward v. Burke, supra; Henry v. Caruthers, supra; City of Del Rio v. Ulen Contracting Corp., supra; Wheaton v. Collins, supra; May v. Getty, supra; Singleton v. Atlantic Coast Line R. Co., supra; Mood v. Methodist Episcopal Church South, supra.

We come now to the cross-appeal. The contention advanced upon it is that the court should have rendered judgment for the additional amount of $108,000, with interest, representing the sum of the installments which were to mature in 1939 and subsequent years. Proof of statements made by Greenleaf and Sauder that they did not intend to make any further payments on the contract, and failure of all defendants to reply to letters discussing the contract and demanding payment of the past due installment, are relied upon to constitute anticipatory breach entitling plaintiffs to recover the entire unpaid balance. The evidence was squarely in conflict upon the question whether Greenleaf and Sauder stated that they did not intend to make any further payments, and the failure to answer the letters demanding payment fell far short of a repudiation of the contract or a declaration of purpose not to make further payments. Plaintiffs requested the court to find that Greenleaf and Sauder announced that they intended to make no further payment and thereby repudiated further liability, and that Moore had refused by conduct to make further payments and had repudiated further liability. The court failed to make such finding. Instead, it found and concluded that the annual installment payments specified and required by the contract were not accelerated either by the terms of the contract or by the acts and conduct of any of the parties. The action of the court amounted to a determination of the issue of fact against plaintiffs. It was tantamount to a finding that the defendants did not announce their purpose not to make any further payments upon the contract. The finding is not clearly erroneous, due regard being given to the opportunity of the trial court to judge of the credibility of the witnesses, and therefore it must stand undisturbed. Rule of Civil Procedure 52(a), 28 U.S.C.A. following § 723c. It follows that plaintiffs were not entitled to judgment for the subsequent installments based upon anticipatory breach of the contract.

The judgment is affirmed.