Louise **HELDENBRAND** and O. J. Heldenbrand, Appellants,

v.

**Bloise STEVENSON, Administrator of the Estate of Charles Oscar Stevenson, deceased, Appellee.**

No. 5581.

United States Court of Appeals
Tenth Circuit.

Oct. 29, 1957.

John B. Dudley, Jr., Oklahoma City, Okl. (Clyde E. Robinson (of Robinson & Armstrong), Watonga, Okl., and J. B. Dudley (of Dudley, Dudley & Dudley), Oklahoma City, Okl., on the brief), for appellants.

Ted R. Fisher, Tulsa, Okl., for appellee.

Before MURRAH, PICKETT and LEWIS, Circuit Judges.

PICKETT, Circuit Judge.

The Administrator of the Estate of Charles Oscar Stevenson brought this action to recover money and property which the defendants Louise Heldenbrand and her husband, O. J. Heldenbrand had received from Stevenson during his lifetime. The case was tried to the court without a jury, which found that the money and properties in question had been received from Stevenson when he was physically and mentally incompetent and incapable of transacting his own business affairs; that during this time the Heldenbrands had exercised undue influence upon Stevenson in violation of the trust and confidence reposed in his niece, Louise Heldenbrand, at a time when Stevenson was dependent upon her to manage his business affairs and look after his welfare. After allowing the defendants the sum of $9,200 for services in caring for Stevenson, the court entered judgment against the defendants for $23,179.71.

Charles Oscar Stevenson, a single man, died in Blaine County, Oklahoma on September 26, 1954, at the age of 82 years. For a period of about two years prior to his death, Stevenson had lived with the Heldenbrands at their home in Watonga, Oklahoma. During this period substantially all of his assets were liquidated and a bank account, containing the sum of approximately $36,000 was established at Watonga. In April of 1953 Stevenson suffered a cerebral hemorrhage and subsequently, until his death, was more or less incapacitated. Thereafter he was in the hospital at different times but the majority of the time he was in the home of the Heldenbrands under the constant care of Louise. In August of 1953 Stevenson created a joint bank account for himself and Louise, with the right of survivorship, by signing the customary form used by the bank for this purpose. Beginning in September of 1953 Louise freely checked out the money in the joint account, some of it even after Stevenson's death. Some of the withdrawals were for the payment of expenses incurred by and on behalf of Stevenson, but most of them were for the purpose of building a home and purchasing an automobile, the titles to which were in the Heldenbrands jointly. The amount of money obtained for the benefit of the Heldenbrands is not in dispute. A gift tax return for the year 1953 was prepared and signed by Stevenson from information furnished by Louise. It listed cash gifts to each of the Heldenbrands of $10,000 during that year, which amounts came out of the joint account.

The Administrator alleges that the joint bank account was made at a time when Stevenson was mentally incompetent and was the result of undue influence exerted upon him by those in a posi-

tion of trust and confidence, and is therefore ineffective. The Heldenbrands allege that prior to February 4, 1953, while Stevenson was living with them, he entered into an oral agreement with Louise, with the consent and approval of her husband; that by this agreement Stevenson was to continue to live with them in their home during his lifetime and that they were to take care of and look after him until his death; and to pay all necessary expenses in connection therewith, including his medical and burial expenses. That as a consideration therefor Stevenson agreed to create a joint bank account with Louise Heldenbrand with right of survivorship. It was further alleged that it was agreed that Louise should buy a site for a new home on such terms as she saw fit and enter into a contract for the construction and equipping of such home, the title to which home was to be taken solely in the Heldenbrands; and that Stevenson was to furnish the money for said home but was to have no interest in it other than the right to live there during his lifetime. It was further alleged that the purchase of the automobile by the Heldenbrands was also a part of the oral agreement. It is the contention of the Heldenbrands "that all the money and property received from the deceased was valid bona fide gifts and was for services, care, comfort, support, love and affection rendered (Stevenson) pursuant to a valid bona fide contract."

The trial court found that the Heldenbrands, particularly Louise, constantly took care of Stevenson from the date of his cerebral hemorrhage until his death; that during this time he was entirely dependent upon them for all of his personal needs and the conduct of his business affairs to such an extent that a relationship of trust and confidence existed between the parties; that the Heldenbrands, particularly Louise, were in a position to and did exercise great influence over Stevenson who, because of his age and illness, was susceptible to suggestions and susceptible to the whims and desires of his niece. The court further found that Stevenson, sometime prior to the alleged contract, was unable to manage or take care of his property unassisted, and by virtue of this circumstance was compelled to rely upon, and did rely upon, the defendants for such assistance; that Stevenson was subject to being influenced by the Heldenbrands; and that he was mentally incapable of making the alleged gifts or arranging for the joint bank account with right of survivorship. The court also found that when the transactions involved herein were made, Stevenson did not have the opportunity or benefit of conferring independently with any person who was competent to inform him correctly as to the legal effect of his transactions with the Heldenbrands.

The evidence as to the mental capacity of Stevenson during the period in question was in sharp conflict. Numerous witnesses, who had known him for years and had had occasion to observe him during this period, testified as to his physical and mental weakness and expressed opinions that he lacked the mental capacity to transact business after he had suffered the cerebral hemorrhage. This evidence was supported by a competent doctor of medicine, a specialist in mental and nervous disorders, who testified to the effect that, in his opinion, a person suffering as Stevenson was, lacked the mental capacity to transact ordinary business. Witnesses for the Heldenbrands, including a doctor of medicine, testified to the contrary. There was evidence that, except for one or two short periods early in 1953, Stevenson lived with the Heldenbrands in their upstairs apartment and was looked after constantly by Louise. There was some evidence that it was difficult for others to have an opportunity to talk to him alone.[1]

1. The day preceding the cerebral hemorrhage Stevenson made a long automobile trip with the Heldenbrands to Stevenson's former home in Kansas, returning the same day. The court's finding as to this trip is as follows:

"(9) The court further finds that on April 19, 1953, following a one-day round

For the purpose of proving the oral contract of February 4, 1953, Louise testified as follows:

"It was February 4th, 1953. Uncle Charley told me at this time how much he enjoyed living with us; that we had made life very pleasant for him, and that if it was all right with us he would like to live with us, but he said, he knew he was making it too crowded for us. We had this small apartment, and of all the relatives I was the only one who could keep him, and I was the only one who lived in an upstairs apartment, and that if it was all right with O.J. and with me he would like for us to have a house to live in, and that if we would make a home for him as long as he lived that he would put up all he had in a joint account with us, and if I didn't want to build the house we could use the money any way I saw fit, and I should see there was always money for his expenses. I told him I would accept his money and I would build a house with it and I would see there was always money for his expenses and for him, and if he lived to be a hundred years old I would take care of him."

Shortly after this conversation, the whole matter was discussed with her husband, in the presence of C. O. Stevenson. In this connection she testified:

"Uncle Charley asked him if it would be all right with him for Uncle Charley to live with us for the rest of his life, and my husband told him it was all right with him, and he told my husband he would like for us to have a home, a house, and that he was going to give us the money to build a house, and explain-

ed to him what he and I had been talking about."

O. J. Heldenbrand did not testify. No one else heard the conversation, and the record does not disclose that anyone other than the Heldenbrands knew anything about it until this action was brought.

 Prior to the conversations from which it is alleged a contract arose, Stevenson had been paying $100 per month for his board and room. There were payments by check through July of 1953 which would equal $100 per month. Louise denied that these checks were for the $100 per month payments, but each check contained a notation indicating that it was a payment of some kind for a particular month. At the discovery proceedings prior to the trial, Louise testified that board and room was paid until the joint account was opened in July. No checks were thereafter issued with a notation as to months on them. The execution and filing of the gift tax return for 1953 is inconsistent with the claim of the Heldenbrands that the withdrawals were made pursuant to the terms of a binding contract to care for Stevenson for the rest of his life. Assuming that Stevenson was competent on February 4, 1953, we think the conversation as to his future care and the payment therefor wholly fails to establish a contract which would bind the parties. To be enforceable, an agreement must be definite and certain as to its terms and requirements. It must identify the subject matter and spell out the essential commitments and agreements with respect thereto. The obligations of the parties must be reasonably certain. 12 Am.Jur., Contracts, § 64; A.L.I. Restatement, Contracts, § 32 (1932); Gilroy v. White Eagle Oil Co., 10 Cir., 201 F.2d 113; Sticelber v. Igle-

trip to Valley Center, Kansas with the defendants, the said C. O. Stevenson had a cerebral hemorrhage and was confined to the hospital until May 30, 1953. (The court thinks it significant that this trip which the defendants and C. O. Stevenson made to Kansas of more than 400 miles was made in one day and so far as

the record discloses, said C. O. Stevenson, if he visited at all with any of his neighbors in his old home community, or with his nephews and nieces who had lived in close proximity to him, such visit was of a very few minutes duration and in the presence of the defendants.)"

hart, 169 Okl. 453, 37 P.2d 638; Petersen v. Pilgrim Village, 256 Wis. 621, 42 N.W. 2d 273, 18 A.L.R.2d 206.

The most that can be said of the conversations is that Stevenson thought the Heldenbrands should have a home and was willing at some future date to make a gift of money for its construction provided he had the right to live in it the rest of his life. At the time of the alleged agreement he had approximately $36,000 in cash. Nothing whatsoever was said as to when the house was to be built or the amount of the joint account to be used. The decision to build a house was not made until September of 1953. It is significant that nothing was done about the joint account until long after the conversations and almost four months after the serious illness and incapacity of Stevenson.

■■ There being no binding contract, the question of a fiduciary relationship and undue influence becomes unimportant if Stevenson was incompetent at the time of the alleged gifts. This leaves the question of the competency of Stevenson to create the joint checking account and make the gifts for the purchase of the house and automobile. The terms "incompetent", "mentally incompetent", and "incapable" have been defined in Oklahoma to mean "any person who, though not insane, is, by reason of old age, disease, weakness of the mind, or from any other cause, unable unassisted, to properly manage or take care of his property, and by reason thereof would likely be deceived or imposed upon by artful and designing persons." Armstrong v. Martin, 203 Okl. 565, 223 P.2d 1072, 1075; Carney v. Brown, 110 Okl. 165, 237 P. 111. See also 20 Words and Phrases, Incompetent, pp. 534, 535. One of the essentials for a valid gift is the competency of the donor to make it. 38 C.J.S. Gifts § 13; Woodruff v. Woodruff, 206 Okl. 3, 240 P.2d 74; Gibbs v. Barksdale, 199 Okl. 141, 184 P.2d 755, 2 A.L.R.2d 345; Jonte v. English, 171 Okl. 291, 40 P.2d 646; Harmon v. Kerns, 169 Okl. 290, 36 P.2d 898. The law is well settled in Oklahoma that to establish a gift inter vivos after the donor's death,

the evidence must be clear, explicit and convincing. Harmon v. Kerns, supra; Weitz v. Moulden, 109 Okl. 119, 234 P. 583. See also Anderson v. Davis, 208 Okl. 477, 256 P.2d 1099; Hickman v. Barrett, 175 Okl. 262, 52 P.2d 40.

■ It is the function of the trial court to resolve all issues and disputes which arise out of conflicting evidence. Findings which are supported by substantial evidence and not clearly erroneous will not be disturbed on appeal. Rule 52(a) Fed.Rules Civ.Proc., 28 U.S. C.A.; United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978; Sowder v. Waray Oil Corp., 10 Cir., 231 F.2d 9; Yokley v. Santa Fe Trail Trans. Co., 10 Cir., 227 F.2d 534; Scott v. Beams, 10 Cir., 122 F.2d 777, certiorari denied Brady v. Beams, 315 U.S. 809, 62 S.Ct. 794, 86 L.Ed. 1208; Sauder v. Dittmar, 10 Cir., 118 F.2d 524.

■ We have carefully considered the entire record and conclude that the court's finding that Stevenson was mentally incompetent and incapable of properly managing or taking care of his property unassisted, and that he was a person who could have been easily deceived or imposed upon by artful and designing persons because of old age, disease, mental weakness or physical infirmities was supported by substantial evidence and is not clearly erroneous.

■ In the preparation of the record on appeal, the appellants filed a condensed statement of the evidence in narrative form. In addition to the narrative statement, they designated for printing certain documents and exhibits which they considered necessary for the determination of the questions to be presented. The narrative statement was submitted to the attorneys for the appellee, who made no objection to it. Within the required time the appellee designated for printing a substantial portion of the evidence in question and answer form, and many additional exhibits, all of which were included in the transcript of the record. Appellee has filed a motion requesting that the costs of printing the

additional designation be assessed against the appellants. Federal Rules of Civil Procedure, Rule 75(c) and (e), provide for the preparation and filing of all or part of the testimony in narrative form and contemplates that all unnecessary and nonessential portions of the record be excluded. Rule 75(e) provides: "For any infraction of this rule or for the unnecessary substitution by one party of evidence in question and answer form for a fair narrative statement proposed by another, the appellate court may withhold or impose costs as the circumstances of the case and discouragement of like conduct in the future may require; and costs may be imposed upon offending attorneys or parties." We have reviewed the record and conclude that the appellants' narrative contained a fair statement of the material evidence and that it was sufficient, together with the designated exhibits, for a proper determination of the issues in this case. The motion to assess to appellants the costs of the additional designation is denied.

Judgment affirmed with the costs to be paid by the appellants except as herein otherwise provided.