**PAINEWEBBER INCORPORATED and Paine Webber Group, Inc., Plaintiffs,**

v.

**CAMPEAU CORPORATION, Defendant.**

**No. 87 Civ. 1535 (RWS).**

United States District Court, S.D. New York.

Sept. 8, 1987.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs; Robert S. Smith, of counsel.

Milberg Weiss Bershad Specthrie & Lerach, New York City, for defendant; Patricia M. Hynes, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff PaineWebber Incorporated ("PaineWebber") has moved for an order pursuant to Fed.R.Civ.P. 12(c), 12(f) and 56 granting judgment on the pleadings, striking all of defendant's defenses and granting summary judgment in its favor in the amount of $7,208,946.62 plus interest. PaineWebber's complaint seeks $4,601,796.62 in investment banker fees allegedly payable under an agreement dated September 11, 1986 ("September 11 Agreement") between it and defendant Campeau Corporation ("Campeau") and $2,607,150 in fees allegedly due under a letter agreement dat-

ed October 9, 1986 ("October 9 Amendment") that amended the September 11 Agreement. Campeau has opposed PaineWebber's motion on the grounds that genuine issues of material fact exist concerning whether PaineWebber is entitled to any further compensation under the two agreements. Upon the following facts and conclusions, the court grants partial summary judgment in favor of PaineWebber in the amount it seeks under the September 11 Agreement and denies summary judgment against PaineWebber for amounts alleged due it under the October 9 Amendment.

## Findings of Fact

The material facts of this case are not in dispute. PaineWebber's claim rests on two documents, the September 11 Agreement and the October 9 Amendment, pursuant to which Campeau agreed to pay specified fees in consideration for PaineWebber's participation in Campeau's acquisition of Allied Stores Corporation ("Allied").

PaineWebber is the investment banking subsidiary of Paine Webber Group, Inc. ("Paine Webber Group"), a New York-based investment banking firm and brokerage house. Campeau is a Toronto-based corporation engaged in the ownership and management of commercial real estate. Pursuant to a letter agreement dated April 4, 1986 ("April 4 Agreement"), Campeau hired PaineWebber to act as a financial advisor in connection with Campeau's evaluation of alternate ways to expand and diversify its operations, including the potential acquisition of Allied.

During the summer of 1986, Campeau arranged several credit facilities in preparation for its bid for Allied. On August 1, 1986, Campeau's chairman contacted Allied's chairman to initiate discussions concerning Campeau's acquisition of Allied. Several meetings followed during which Campeau and Allied discussed various business proposals, including the purchase by Campeau of Allied's shopping centers. These discussions proved unsuccessful. On September 3, 1986 Allied informed Campeau that it was not prepared to continue discussions regarding the shopping centers.

On September 11, 1986, in response to a merger proposal from Campeau, Allied issued a press release stating that its board of directors had declined to accept Campeau's invitation to negotiate a merger.

### The September 11 Agreement and Campeau's Tender Offer

Having determined to proceed with a hostile tender offer for Allied's shares, Campeau entered into separate agreements with PaineWebber and The First Boston Corporation ("First Boston") on September 11, 1986 pursuant to which these firms were hired as financial advisors with respect to the proposed acquisition of Allied. The September 11 Agreement established a five part structure for the fees and services of PaineWebber. Pursuant to paragraph 1(a), upon signing of the agreement PaineWebber received a "financial advisory fee" of $1,148,203.38, of which $418,703.51 had already been paid to PaineWebber, presumably pursuant to the April 4 Agreement. Paragraph 1(a) also provides that PaineWebber would be reimbursed for "reasonable out-of-pocket expenses incurred by PaineWebber, including reasonable fees and disbursements of its counsel, in connection with its services hereunder and its services under" the April 4 Agreement.

Paragraph 1(b) provides: "If within the next 12 months, an Acquisition shall be consummated, PaineWebber will receive a fee of $5,750,000 (against which all financial advisory fees paid under paragraph (a) shall be credited) upon consummation of such Acquisition." [1] Thus, paragraph 1(b) provides for what is commonly known as a bonus payment to PaineWebber should Campeau prove successful in its bid for Allied.

In consideration for PaineWebber's agreement to act as a placing agent in connection with Campeau's efforts to raise funds to finance its bid for Allied, paragraph 1(c) provides that PaineWebber will receive "fees, in such amounts and at such times agreed between Campeau and the lead manager for the offering,[2] as represent customary fees for the nature and amount of the securities issued." Thus, paragraph 1(c) expressly reserves the question of the amount of fees to be paid for services to be rendered by PaineWebber as a placing agent and is prospective in this regard.

Similarly, paragraph 1(d) provides in general and prospective terms that Campeau will pay an "additional cash fee" to PaineWebber in consideration for services that the latter may be called upon to provide in connection with any future renegotiations of Campeau's then existing bank commitments. Finally, paragraph 1(e) provides that if PaineWebber shall render services in connection with Campeau's acquisition of Allied's assets other than pursuant to an Acquisition, as defined in paragraph 1(b), Campeau shall pay a "cash fee" to PaineWebber "in an amount to be mutually agreed between Campeau and PaineWebber based upon the nature of the transaction in question and the services provided to Campeau by PaineWebber."

The other two provisions of the September 11 Agreement pertinent to this dispute are paragraphs 3 and 6. Paragraph 3 gives Campeau the right to terminate PaineWebber's services at any time without continuing liability provided that "the fee arrangement set forth in paragraph 1(b) ... shall remain operative and in full force and effect regardless of any termination of this agreement." Paragraph 6 provides that the September 11 Agreement super-

---

**1.** An "Acquisition" is defined in the September 11 Agreement, and for purposes of this opinion, as "(i) the acquisition by Campeau and its affiliates of at least a sufficient number of shares of each class of capital stock or other voting securities of Allied so that Campeau and its affiliates would be able, without the vote of any other shareholder, to take any action required by holders of each such class to approve any lawful merger of Allied and Campeau or an affiliate of

Campeau that Campeau may wish to consummate; (ii) a merger or consolidation involving Campeau or any of its affiliates and Allied; or (iii) the transfer of all or substantially all the assets of Allied to Campeau or any of its affiliates."

**2.** Paragraph 1(c) named First Boston as lead manager.

sedes all terms and provisions of the April 4 Agreement.

The day after Campeau executed the letter agreement with PaineWebber, Campeau filed its Offer to Purchase for Cash ("Offer to Purchase") with the Securities and Exchange Commission ("SEC") and thus commenced its tender offer for Allied's shares. The cover page of the Offer to Purchase lists First Boston and Paine-Webber as dealer managers for the offer and references to the services of these two investment banks appear throughout the document. Section 17 on page 28 of the Offer to Purchase states that First Boston and PaineWebber "are acting as financial advisors" to Campeau in connection with the offering. Section 17 also states: "[f]or its services to date as financial advisor and a Dealer Manager," Campeau has "agreed to pay PaineWebber a fee of $1.15 million. In the event an Acquisition occurs within one year, PaineWebber will receive an additional fee of $5.75 million (against which $1.15 million of the fees then already paid will be credited)." Thus, the Offer to Purchase filed by Campeau with the SEC describes in unambiguous terms its fee arrangements with PaineWebber, including the bonus payment that would become payable upon consummation of the Acquisition.

**The October 9 Amendment**

On September 24 and October 9, 1986 Campeau entered into commitment letters ("Commitment Letters") with each of First Boston and Paine Webber Group. Pursuant to the September 24 letter, First Boston and Paine Webber Group promised to purchase up to $455 million and $245 million, respectively, of securities to be issued by a Campeau subsidiary to finance Campeau's tender offer for Allied's shares. As consideration for their commitments, First Boston and Paine Webber Group were paid fees of $4.55 million and $2.45 million, respectively. Pursuant to the October 9 letter First Boston and Paine Webber Group agreed to increase their respective commitments to purchase securities to up to $700 million and $365 million in return for additional commitment fees of $2.45 million and $1.2 million, respectively. Both of the

Commitment Letters provided that "[n]one of the fees provided for in this letter agreement shall be credited against or offset against any other fees ... paid to or due to PaineWebber Incorporated ... pursuant to ... the letter agreement dated September 11, 1986, as amended between Campeau and PaineWebber Incorporated."

Apparently in connection with the Commitment Letters of September 24 and October 9 between Campeau and Paine Webber Group, Campeau and PaineWebber amended the September 11 Agreement by two letter agreements dated September 23 and October 9, each of which modified paragraph 1(b) of the September 11 Agreement. The cumulative effect of these amendments was to add the following sentence to the end of paragraph 1(b), which reads as follows:

> In further consideration for additional financial advisory services to be rendered by PaineWebber pursuant hereto, at the time of the merger of an affiliate of Campeau and Allied, Campeau will, at its option, (i) transfer to PaineWebber warrants to purchase 104,286 subordinated voting shares of Campeau at an exercise price equal to the closing sales price of such shares on the Toronto Stock Exchange on September 23, 1986, which warrants will expire five years from the date of issuance and will contain antidilution provisions and other terms customary in transactions of this type or (ii) make a cash payment to PaineWebber of $2,607,150 in immediately available funds.

Except as specifically set forth in the October 9 Amendment, the September 11 Agreement remained unmodified and in full force and effect. Thus, the additional compensation provided by the October 9 Amendment was prospective and by its terms dependent upon PaineWebber rendering financial advisory services after October 9, 1986.

**From Tender Offer to Open Market Purchases**

On October 24, 1986, Campeau terminated its tender offer and began acquiring Allied's shares directly through open mar-

ket purchases. According to the affidavits submitted by the parties, on the morning of October 24, two telephone conversations took place between Robert Campeau (also "Campeau"), Campeau's chief executive officer, and D. Barry O'Connor ("O'Connor"), a managing director of PaineWebber. During the first, Campeau asked O'Connor if PaineWebber would provide financing for continued attempts to acquire Allied in the face of Allied's adoption of a "shareholders rights plan," otherwise known as a "poison pill," designed to stymie Campeau's bid. During the second, some five minutes later, Campeau asked O'Connor if PaineWebber would finance open market purchases of Allied common stock. O'Connor replied no. At this point, Campeau told O'Connor that PaineWebber was "out of the deal." O'Connor responded that he understood Campeau's position.

On October 31, 1986, Campeau completed the open market purchase of 25,800,000 shares of Allied which gave Campeau and its subsidiaries ownership of a majority of Allied's outstanding shares. On December 31, 1986, Allied was merged into Campeau.

## Summary Judgment

In order to grant summary judgment, this court must determine that no genuine issue of material fact exists. *See* Fed.R. Civ.P. 56(c). The court's responsibility is not to resolve disputed issues of fact, *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11

(2d Cir.1986), *cert. denied,* ── U.S. ──, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987), but to determine whether there are any factual issues to be tried, while resolving ambiguities and drawing inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). Summary judgment enables a court to "streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 12.

PaineWebber has moved for summary judgment and to strike all of Campeau's affirmative defenses. Campeau opposes PaineWebber's motion[3] on the grounds that there are genuine issues of material fact about (1) the meaning of the agreements and the intentions of the parties[4] and (2) whether the agreements were rescinded.[5]

## Failure to Perform

### 1. *The September 11 Agreement*

In support of its claim that PaineWebber failed to perform its obligations under the September 11 Agreement, Campeau has submitted an affidavit by James T. Roddy, an executive vice-president of Campeau, which lists a number of activities that Campeau believed to be encompassed by the

---

**3.** With respect to the following of Campeau's affirmative defenses, (1) Campeau has not opposed PaineWebber's motion to strike its First Affirmative Defense (failure to state a claim upon which relief can be granted), and that motion is granted; (2) Campeau's Fifth Affirmative Defense (Paine Webber Group agreed to pay its own legal fees and expenses) does not appear to be disputed in PaineWebber's current submissions and is, therefore, not affected by today's decision; (3) Campeau's Ninth Affirmative Defense (it has fully paid PaineWebber and Paine Webber Group) will be treated as a general denial of PaineWebber's complaint; and (4) Campeau's Tenth Affirmative Defense (mutual mistake or fraud) is dismissed for lacking the specificity required by Fed.R.Civ.P. 9(b). Further, in view of the fact that Campeau's counsel drafted the September 11 Agreement, which was entered into between sophisticated, counseled businessmen, Campeau's request for leave to replead its Tenth Affirmative Defense is denied.

**4.** Upon a fair reading of Campeau's Answer and Counterclaims, it appears that Campeau's Second, Third, Fourth, Sixth, and Seventh Affirmative Defenses turn on the same allegation: namely, that PaineWebber failed to perform its obligations under the two agreements. Accordingly, for purposes of this opinion, these five defenses are treated as raising the issues of what the parties intended to be PaineWebber's obligations and whether PaineWebber has met them.

**5.** Although pleaded in the most general of terms, Campeau's Eighth Affirmative Defense (PaineWebber and Paine Webber Group are equitably estopped from maintaining this action) presumably rests on the argument that Campeau was justified in relying on what it assumed to be PaineWebber's rescission of the agreements. This defense simply, though obliquely, restates Campeau's Twelfth Affirmative Defense (rescission) and will be so treated.

"services" that PaineWebber had agreed to render as a "financial advisor." However, the Roddy affidavit does not state that Campeau ever asked PaineWebber to provide any of these services, nor does it refer to a single specific instance in which PaineWebber was called on to perform a particular task but failed to do so.

For its part, PaineWebber has not taken issue with the list of activities put forth by Campeau as services it looked to in a financial advisor and has submitted the affidavit of W. Peter Slusser, a managing director of PaineWebber, which states that between April 1986 and September 1986 PaineWebber acted as Campeau's "exclusive investment banker ... providing all the customary functions provided by investment bankers—analysis of Allied's value, recommendation of an acquisition structure, solicitation of financing and similar matters ... [and introducing] Robert Campeau ... to the chairman and chief executive officer of Allied." PaineWebber has also submitted a copy of Campeau's Offer to Purchase, filed with the SEC on September 12, which, as mentioned above, lists PaineWebber as a manager dealer of the tender offer along with First Boston.[6] In addition, PaineWebber has submitted copies of the letter agreements dated September 24 and October 9, 1986 pursuant to which Campeau agreed to pay, and even increase, additional fees to PaineWebber for additional services it might be called on to perform. Upon these uncontested facts, the Roddy affidavit contains only the conclusory statement that "[a]fter September 11, 1986, PaineWebber did not provide any of the financial advisory services contemplated by the September 11 Agreement." Campeau's submissions to the SEC—which clearly evince PaineWebber's participation in the structuring of the bid for Allied—preclude that conclusion.

Returning to the express language of the September 11 Agreement, the court finds the fee arrangements to be free from ambiguity. The introductory paragraph confirms that PaineWebber "has been engaged" to act as Campeau's financial advisor with respect to the proposed acquisition of Allied. Paragraph 1(a) indicates that nearly half of PaineWebber's "compensation for services" as a financial advisor had already been received prior to September 11, 1986. Together with the reference to the April 4 Agreement, the opening paragraphs of the September 11 Agreement express an intent to memorialize a fee arrangement for an ongoing relationship pursuant to which PaineWebber had and would continue to render investment banking services to Campeau.

Similarly, there is nothing ambiguous about paragraph 1(b). The bonus payment provided for in paragraph 1(b) is conditioned upon the occurrence of a well-defined event, that is, an Acquisition of Allied. There is nothing on the face of the agreement that suggests PaineWebber would have to perform additional services in order to receive the bonus payment of $5.75 million. Where the occurrence of a condition is required by the agreement of the parties, rather than as a matter of law, the court will apply a rule of strict compliance. E.A. Farnsworth, Contracts 544 (1982). New York courts have applied this rule in cases where an investment banking contract unambiguously provides for compensation upon the completion of a transaction and that transaction is consummated. *See e.g., DeFren v. Russell,* 71 A.D.2d 416, 422 N.Y.S.2d 433 (1st Dep't 1979) (payment of $75,000 fee conditioned upon "consummation of a binding [acquisition] agreement); *Lazard Freres & Co. v. U.S. Industries, Inc.,* N.Y. Law Journal, June 10, 1985 at 12 (Sup.Ct.N.Y.Cty.1985) (payment of $3.5 million fee conditioned upon consummation of "definitive agreement" for sale of defendant's stock); *see also Sutton v. East River Savings Bank,* 55 N.Y.2d 550,

---

**6.** In paragraph 12 of the Roddy affidavit, Roddy states: "While PaineWebber was listed as a dealer manager on Campeau's tender offer documents, PaineWebber did not 'act' as a dealer manager." If taken as true, this assertion would plainly suggest that the cover page of a document filed with the SEC contained a bold-faced misrepresentation of a material fact in connection with a transaction that contemplated the purchase and sale of securities registered under the Securities and Exchange Act of 1934.

450 N.Y.S.2d 460, 435 N.E.2d 1075 (1982) (payment of real estate brokerage fee conditioned upon "sale" of building).

Campeau's efforts to show that Paine-Webber did not earn its fee are unavailing. Campeau alleges that PaineWebber did not act as a "placing agent," did not provide financing to Campeau, and did not assist in devising alternate strategies for acquiring Allied. Apart from Campeau's failure to allege that it ever specifically requested any of these services from PaineWebber, the September 11 Agreement, to the extent that it refers to any of the above services, expressly reserves the question of the fees that Campeau will pay to PaineWebber in consideration therefor. Thus, paragraph 1(c) provides that PaineWebber will be paid "customary fees" for acting as a placing agent, paragraph 1(d) provides that PaineWebber will be paid an "additional cash fee" for renegotiating Campeau's existing bank commitments, and paragraph 1(e) provides that PaineWebber will receive a "cash fee ... in an amount to be mutually agreed between Campeau and PaineWebber" for helping Campeau to acquire assets of Allied other than pursuant to an Acquisition. The September 11 Agreement does not state, however, that PaineWebber's right to receive the bonus payment in paragraph 1(b) is conditioned upon the rendering of services outlined in paragraphs 1(c)–(e).

## 2. *The October 9 Amendment*

■ Campeau's submissions make a stronger showing against PaineWebber's claim for summary judgment under the October 9 Amendment. As mentioned above, the October 9 Amendment obligated Campeau to pay an additional fee in consideration for "additional financial advisory services to be rendered by PaineWebber."

The Roddy affidavit claims that Paine-Webber rendered no financial advisory services after October 9, 1986. PaineWebber has not disputed this charge, except to state that Campeau never asked it to provide any services. The Roddy affidavit also asserts that it was understood by all parties that under the September 23 and October 9 amendments PaineWebber was to receive an "additional advisory fee if it rendered certain financial advisory services in connection with the bridge financing" that Paine Webber Group had agreed to provide in the Commitment Letters. PaineWebber's affidavits do not contradict this charge either.

PaineWebber has cited the parole evidence rule to object to Campeau's claim that the October 9 Amendment should be interpreted only in the context of the Commitment Letters. It is true, as PaineWebber argues in its memoranda of law, that parole evidence may not be relied on to vary or contradict the terms of unambiguous written agreements. *Laskey v. Rubel Corp.*, 303 N.Y. 69, 100 N.E.2d 140 (1951). However, "the parole evidence rule is not violated when the oral evidence does not alter or vary the writing or insert an additional term, but simply explains the meaning of a term or illuminates the consideration." *Bird v. Computer Technology, Inc.*, 364 F.Supp. 1336, 1343 (S.D.N.Y. 1973); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 896 (2d Cir. 1976) ("The essential tool in properly interpreting a contract is to first ascertain the intent of the parties.... Unless the intent is unambiguous from the four corners of the documents, extrinsic evidence of the parties' intent should be received.").

The record here reveals sufficient ambiguity concerning the meaning of "additional financial advisory services" to preclude strict application of the parole evidence rule. The O'Connor affidavit shows that the same Paine Webber official (O'Connor) was responsible for negotiating both the September 23 and the October 9 Amendments on behalf of PaineWebber and the September 24 and October 9 Commitment Letters on behalf of Paine Webber Group. The fees payable to PaineWebber and Paine Webber Group under the October 9 Amendment and the October 9 Commitment Letter, respectively, represented identical (50%) increases over the fees payable under the earlier versions of those agreements. Thus, there is evidence to support Campeau's claim that there are genuine issues of material fact as to whether the

parties intended "additional financial advisory services" to be rendered by PaineWebber to refer implicitly to the bridge financing to be provided by Paine Webber Group.

PaineWebber has also objected to Campeau's claims of non-performance by asserting that the terms of the October 9 commitment Letter (1) obligated Paine Webber Group to assist only in the financing of a tender offer for Allied's shares, not open market purchases of those shares, and (2) relieved Paine Webber Group of any obligation to provide financing in the event that Allied changed its capital structure. Having concluded that genuine issues of material fact exist concerning the obligation of PaineWebber under the October 9 Amendment, the court need not decide these questions on this motion. PaineWebber's motion for summary judgment on the October 9 Amendment is denied.

### Rescission of the Agreements

Campeau asserts that there is a genuine issue of material fact as to whether PaineWebber rescinded both the September 11 Agreement and the October 9 Amendment during the telephone conversation between O'Connor and Campeau on October 24, 1986. In support of this claim, Campeau has submitted the affidavit of Robert Campeau. Regarding the exchange between Campeau and O'Connor in which Campeau stated that PaineWebber's refusal to participate in the financing of open market purchases of Allied shares meant that PaineWebber was "out of the deal" and O'Connor replied that he understood Campeau's position, the Campeau affidavit states: "I understood, and I believe that Mr. O'Connor understood, that the agreements at issue were being rescinded and that PaineWebber's rights and obligations under the agreements were being terminated. Mr. O'Connor certainly did not suggest otherwise." Unfortunately, Campeau's testimony does not establish a rescission of the agreements in dispute.

Under New York law, Campeau must make a strong showing that PaineWebber positively and unequivocally assented to rescission. In *Armour & Company v. Celic*, 294 F.2d 432, 435–36 (2d Cir.1961), the Second Circuit summarized New York law on this issue as follows:

It is axiomatic that the rescission of a contract by abandonment requires mutual assent of the parties. *Re Huxley*, 1945, 294 N.Y. 146, 61 N.E.2d 419, 169 A.L.R. 194; *City of Del Rio v. Ulen Contracting Corp.*, 5 Cir., 1938, 94 F.2d 701, 704; 6 Corbin, Contracts § 1293 at 147 (1951). The abandonment of a contract can, of course, be inferred from attendant circumstances and conduct of the parties. *Brockhurst v. Ryan*, 1955, 2 Misc.2d 747, 146 N.Y.S.2d 386, 390 (Sup.Ct.1955); *In re Schanzer's Estate*, 1959, 7 A.D.2d 275, 182 N.Y.S.2d 475, 479; Restatement, Contracts § 406, comment b (1932). Where conduct is relied upon to establish the abandonment, the acts of the parties must be positive, unequivocal and inconsistent with an intent to be further bound by the contract. *City of Del Rio v. Ulen Contracting Corp.*, supra, 94 F.2d at page 704; *Sauder v. Dittmar*, 10 Cir., 1941, 118 F.2d 524, 530. The termination of a contract is not presumed, and the burden of establishing it rests upon the party who asserts it. See *Arzani v. People*, Sup.1956, 149 N.Y.S.2d 38.

By Campeau's own admission, O'Connor's response that he understood Campeau's position amounts to no more than an "acknowledgment" of his statement. Contrary to Campeau's assertion, O'Connor's failure to object to Campeau's statement that PaineWebber was out of the deal does not establish a rescission. "Mere failure to object to a repudiation … is not a manifestation of assent to an agreement of rescission." Restatement, Contracts § 283 Comment a.

This is not a case where "reasonable men might differ as to the inferences to be drawn from either conflicting or undisputed facts …." *Invengineering, Inc. v. Foregger Co.*, 293 F.2d 201, 203 (3d Cir. 1961). Campeau has failed to show that there is a genuine issue for trial with regard to whether PaineWebber rescinded either of the agreements.

## Conclusion

For the reasons given above, the court grants PaineWebber partial summary judgment in the amount of $4,601,796.62 plus interest for its claim under the September 11 Agreement.